# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARRY STOUFFER | : | |
| | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No.  15-3523 |
| THE CITY OF READING, et al. | : | |

## MEMORANDUM OPINION

**SCHMEHL, J.   /s/ JLS**                                                **December 13, 2017**

Plaintiff brought this civil rights action under 42 U.S.C. § 1983, claiming the defendants violated his constitutional rights under the Fourth and Fourteenth Amendments as a result of actions they allegedly took regarding the partial demolition of a building on property Plaintiff owned in the City of Reading. Plaintiff seeks damages for the loss and reconstruction of the building as well as for the loss of certain personal property which he claims was destroyed or stolen from the property. Named as defendants are the City of Reading, Vaughn Spencer, the former Mayor of the City of Reading, William Heim, the Chief of Police of the City of Reading, Brian Nicarry, the Director of Bureau of Building/Trade/Fire of the City of Reading, O'Brien Wrecking Company, Inc. and a number of John Does (collectively, the "defendants"). The defendants were subsequently granted leave to file a third party complaint against Dinosaur Demolition, LLC and O'Brien Wrecking Company. Presently before the Court is the defendants' motion for summary judgment. For the reasons that follow, the motion is granted.

## STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

## INDIFFERENCE OF PLAINTIFF'S COUNSEL

Incredibly, Plaintiff's counsel never conducted any discovery in this matter, including noticing depositions, serving subpoenas or propounding written discovery. In addition, Plaintiff''s counsel has repeatedly failed to timely and adequately respond to defendants' requests for production of documents as well as to Orders from this Court and Magistrate Judge Lloret compelling Plaintiff to do so. (ECF 24, 52.) As a result, defendants have also filed a motion for sanctions, seeking dismissal of this action in its entirety. Furthermore, after defendants filed their motion for summary judgment, Plaintiff's counsel began to file motions for extensions of time to respond to the motion for summary judgment   (ECF 60, 64), both of which were opposed by defendants. Nevertheless, the Court very leniently granted both motions for extensions. (ECF 63, 66.) The response ultimately filed by Plaintiff''s counsel consisted of two paragraphs requesting that the Court  deny the motion for summary judgment "for the reasons set forth in Plaintiff's accompanying Memorandum of Law Contra Motion for Summary Judgment." (ECF 68.)  However, Plaintiff's response did not contain any such "accompanying Memorandum of Law." (ECF 68.) Plaintiff's counsel also failed to respond to defendants' statement of undisputed facts in support of their motion for summary judgment. (ECF 55.)

Accordingly, the Court finds that the following facts are either not in dispute or construed in the light most favorable to Plaintiff.  The exhibits cited refer to the exhibits attached to defendants' statement of undisputed facts. (ECF 55.)

1. Plaintiff, Harry Stouffer is the owner of 1237 Buttonwood Street, Reading, Pennsylvania, and he still owns the property today. (N.T., Harry Stouffer, March 1, 2016, at p. 30, Exhibit "1"). (1237 Buttonwood Street is referred to as "the Property" and the structure on 1237 Buttonwood Street is referred to as "the Building").

2. Stouffer is a Caucasian male. (See defendants' Requests for Admission Directed to Plaintiff, Harry Stouffer at No. 21. Exhibit "2"). Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

3. At all times relevant to this lawsuit, Defendant, Vaughn Spencer ( "Mayor Spencer"), was the Mayor of the City of Reading. (See Affidavit of Vaughn Spencer, Exhibit "3").

4. At all times relevant to this lawsuit, Defendant, William Heim ("Chief Heim"), was the Chief of Police for the City of Reading. (See Affidavit of William Heim, Exhibit "4").

5. At all times relevant to this lawsuit, Defendant, Brian Nicarry ("Inspector Nicarry"), was a Building Inspector for the City of Reading. (See Affidavit of Brian Nicarry, Exhibit "5").

6. Stouffer testified that the local water company shut off the water to the Building in 1990 or 1991, and the water meter had been removed. (Exhibit "1" at pp. 40-41).

7. Public gas and electricity had been cut off from the Building prior to June 2013, but Stouffer does not recall when they were discontinued. (Exhibit "1" at pp. 46-47).

8. In 2000 or 2001, there was a fire at the Building which Stouffer suspects was caused by arson. (Exhibit "6", at p. 55).

9. As of June 2013, Stouffer had performed improvements to six rooms in the Building. (Exhibit "6" at p. 56).

10. The City of Reading Blighted Property Review Committee certified the Building as blighted on November 18, 2010. (Exhibit "7").

11. The City of Reading Blighted Property Review Committee based its determination on the following reasons:

   1) Any premises which because of physical condition or use is regarded as a public nuisance at common law, or has been declared a public nuisance in accordance with the local housing, building, plumbing, for and related codes. 2) Any dwelling which because of its dilapidated, unsanitary, unsafe, vermin infested state or because of its lacking in the facilities and equipment required by the housing or building codes of the municipality, has been designated by the department responsible for enforcement of the code as unfit for human habitation. 3) Any structure which is a fire hazard, or is otherwise dangerous to the safety of persons or property. 4) Any structure, form in which utilities, plumbing, heating, sewerage or other facilities have been disconnected, destroyed, removed or rendered ineffective so that the property is unfit for its intended use.

   (Notice of Designation of Blighted Property for 1237 Buttonwood Street, Exhibit "8").

12. Stouffer testified that he spoke with Lee Olsen, who was a member of the City of Reading Blighted Property Review Committee, and testified that Olsen told Stouffer he would take the Property off the Blighted Property list; however, according to Stouffer, Olsen never removed the Property from the list. (Exhibit "6" at pp. 54-55).

13. Stouffer did not live at the Property. He occasionally stayed there overnight when he came back from a road trip. (N.T. Harry Stouffer from August 19, 2013 Appeal Hearing before the Building and Fire Code Board of Appeals of the City of Reading at pp. 65-66, Exhibit "9" ).

14. In the five years preceding June 2013, the longest consecutive period that Stouffer stayed in the Building was three days. (See Exhibit "1" at p. 48).

15. On June 25, 2013, Stouffer was in the Building when he heard members of the Reading Police Department yelling outside. (Exhibit "1" at pp. 62-63).

16. Stouffer went outside to investigate and observed what turned out to be a four by nine foot section of bricks on the sidewalk that had fallen from between the second floor windows of the Building. (Exhibit "9" at p. 17; Exhibit "1" at p. 84); (see also photographs attached to Affidavit of Brian Nicarry (Exhibit "5" at Exhibit "A").

17. Initially, the police would not permit Stouffer to reenter the Building, but Stouffer explained that he needed to get some personal items and invited the police to come in with him. The police followed him in while Stouffer retrieved some items. Stouffer and the police were in the Building for five to seven minutes. (Exhibit "1" at pp. 67-69, 85-86).

18. The police would not let Stouffer back in the building again, and Stouffer was upset about it. (Exhibit "1" at p. 71).

19. Stouffer became annoyed and boisterous because he felt he was being disrespected as a property owner. (Exhibit "1" at pp. 82-84).

20. One of the City of Reading's Assistant Solicitors, Frederick T. Lachat, III, Esquire ("Lachat") arrived on the scene and handed Stouffer a letter from Nicarry which stated that inspection revealed that the Building is an "**unsafe structure which represents an immediate and imminent danger to public safety pursuant to § 403.84 of the Pennsylvania Uniform Construction Code (PA UCC)** and therefore under Section 116 and/or 117 of the International Existing Building Code (IBEC), as adopted by the Pa. UCC and Chapter 5 of the City of Reading Codified Ordinances, **immediate emergency demolition is required**." (Exhibit "1" at pp. 70-74); (see also June 25, 2013 letter from Brian Nicarry to Harry Stouffer, Exhibit "10"). (emphasis in original.)

21. Stouffer wrote on the letter "I appeal all that in [sic] this letter" and handed it back to Assistant Solicitor Lachat. (Exhibit "1" at pp. 74; see also Exhibit "10").

22. After Nicarry arrived at the scene, Stouffer told Nicarry and Lachat that he had timber inside and he could shore up the Building. (Exhibit "1" at p. 81).

23. Although the collapse happened on a Tuesday night, Stouffer told Inspector Nicarry that he could have the Building "shored up" by Sunday. (N.T. Brian Nicarry from August 19, 2013 Appeal Hearing before the Building and Fire Code Board of Appeals of the City of Reading at pp. 89-90, Exhibit "9").

24. Nicarry would not let Stouffer reenter the Building. (Exhibit "1" at p. 82).

25. Instead, Nicarry determined the front portion of the Building should be partially demolished. (Exhibit "5" at ¶¶ 17-18).

26. When Stouffer saw demolition contractors on the roof cutting holes with a chainsaw, he yelled at the contractor with the chainsaw to "get the hell off the roof." (Exhibit "1" at pp. 89-90).

27. There were young children and a large crowd around, and Stouffer testified that he used "bad words." (Exhibit "1" at pp. 93-95).

28. A Sergeant with the Reading Police Department warned Stouffer about his language and yelling at the contractor on the roof with a chainsaw. (Exhibit "1" at p. 91).

29. Stouffer continued to yell, use inappropriate language around children, and his actions distracted the contractor on the roof with a chainsaw, so Reading Police Officer Danny Voorhies ("Officer Voorhies") arrested Stouffer for disorderly conduct. (See June 25, 2013 Incident Report for Incident No. 2013-41832 by Officer Danny Voorhies. Exhibit "11"); (see June 25, 2013 Non-Traffic Citation for Disorderly Conduct, Exhibit "12").

30. Inspector Nicarry did not order, direct or suggest that Stouffer should be arrested. (Exhibit "5" at ¶ 31).

31. When Stouffer was arrested for disorderly conduct, he was taken to County lockup where he remained for approximately two hours. (Exhibit "1" at p.101).

32. Following his release from County lockup, Stouffer returned to the Property sometime after 9:00 PM and noticed that the Building had been partially demolished. (Exhibit "9" at pp. 64-65).

33. The next day, June 26, 2013, Stouffer and his grandson removed certain "bare essentials" from the remaining portion of the Building. (Exhibit "1" at pp. 106-108).

34. On June 27, 2013, Stouffer again returned to the Property in the morning to remove items from the Building, but police officers told him that he could not enter the Building. (Exhibit "1" at pp. 115-116).

35. Subsequently, the City of Reading's Director of Codes, Ronald Natale ("Natale"), appeared and handed Stouffer a second notice which declared that the remaining portion of the Building is an "**unsafe structure which presents an immediate and imminent danger to public safety** pursuant to **§ 403.84 of the Pennsylvania Uniform Construction Code (PA UCC)**…" This notice further advised that "**DUE TO VARIOUS CLEAR AND PRESENT DANGERS, INCLUDING THE THREAT OF FALLING DEBRIS OR FURTHER COLLAPSE, THIS BUILDING IS ORDERED TO BE VACATED AND ENTRY INTO THIS BUILDING IS STRICTLY PROHIBITED. . ."** (See Exhibit "1" at p. 117-118; see also June 27, 2013 notice attached to Exhibit "5" as Exhibit "D").

36. Stouffer immediately appealed "everything in" the June 27, 2013 notice and handed it back to Natale. (Exhibit "1" at p. 121).

37. Natale would not let Stouffer go back in the Building, but he did permit Stouffer to take items from outside the Building. (Exhibit "1" at pp. 121-123).

38. When Stouffer returned later in the day on June 27, 2013, he noticed workmen from O'Brien Wrecking Company were installing a fence around the Property,

and they would not let Stouffer take any more items from outside the Building. (Exhibit "1" at pp. 124-125).

39. Stouffer did not return to the Property for several weeks. However, a few weeks later he received a call from his friend who told him that people were taking things from the Property. (Exhibit "1" at pp. 131-132).

40. Stouffer called the police and met them at the Property. The police checked the back door, but they were afraid to enter the Building because it was falling down. (Exhibit "1" at pp. 133-134, 137).

41. Stouffer testified that from the time of the partial demolition of the Building until the final demolition, he called the police between four and six times to report that people were breaking into the Building. (Exhibit "1" at pp. 141-142).

42. Stouffer acknowledged that he did "sneak" into the Building every time he noticed there was no placard on it. (Exhibit "6" at pp. 95-96).

43. In the first week of June 2013, approximately three weeks before the partial collapse of the Building, there was a tragic incident in the City of Philadelphia where a building collapsed onto the Salvation Army on Market Street and resulted in several deaths and many injuries. (N.T. Frederick T. Lachat, III, Esq, on May 5, 2017, at pp. 42-43, Exhibit "13").

44. As a result of the collapse in Philadelphia, Inspector Nicarry and Assistant Solicitor Lachat had been working on contingency plans for potential collapses in the City of Reading. (Exhibit "13" at p. 43).

45. On the evening of June 25, 2013, Inspector Nicarry received a call from Lieutenant Fire Marshall Larry Moyer to come out to 1237 Buttonwood Street

because there had a been a partial building collapse. (Exhibit "5" at ¶ 11; Exhibit 5 at Exhibits and B).

46. Nicarry averred that when he arrived on the scene, he observed the following:

a) Bricks had fallen from the second floor front of the building, and were lying in a pile on the sidewalk of Buttonwood Street. (See Exhibit "5" at ¶ 13(a));

b) The bricks that had fallen were not merely a façade; they were structural bricks designed to support the building. This [conclusion] is reflected by the courses of bricks were joined at regular intervals by bond courses of bricks. (See Exhibit "5" at ¶ 13(b); see also Exhibit "9" at pp. 87-88);

c) Where the bricks had fallen from the front of the Building, the only thing blocking the view into the second floor rooms was interior plywood paneling which had been placed directly over the bricks. (See Exhibit "5" at ¶ 13(c)).

d) Inspector Nicarry also believed the floor joists that were exposed when the wall fell away were rotten and decayed from a long period of water penetration into the building. (See Exhibit "5" at ¶ 13(d); see also Exhibit "9" at p. 85);

e) The cornice was considerably bowed as a result of pressure. (See Exhibit "5" at ¶ 13(e); see also Exhibit "9" at p. 86);

f) On the side of the building a spider-webbed crack followed the mortar line to the top corner of the building, and Inspector Nicarry believed this section was ready to break away. (See Exhibit "5" at ¶ 13(f); see also Exhibit "9" at p. 88);

g) A PVC pipe running down the side of the building was buckled from pressure from compression force. (See Exhibit "5" at ¶ 13(g); see also Exhibit "9" at p. 88).

47. Based upon Inspector Nicarry's observations, including but not limited to the items mentioned in paragraphs 46(a) – (g), Inspector Nicarry believed "the condition of the building posed a threat to the safety of anyone who was inside the building and to anyone who was in the vicinity of the building, and he believed the building presented an imminent danger to public safety due to the

possibility of further collapse." (See Exhibit "5" at ¶ 14); (see also Exhibit "9" at p. 88).

48. Upon his assessment of the Building and determination that the Building presented an imminent danger of collapse, Inspector Nicarry called Assistant Solicitor Lachat and asked him to type a notice to the property owner advising of the need for the emergency demolition of the building. (See Exhibit "5" at ¶ 15).

49. Due to Inspector Nicarry's concern that the building presented an imminent danger of collapse, he contacted Dinosaur Demolition to see if they could demolish only the front part of the Building on an emergency basis. (See Exhibit "5" at ¶ 17).

50. Safety was Inspector Nicarry's primary concern. Since the Building was falling, Inspector Nicarry believed that Stouffer's proposal to have the Building shored up by Sunday would not abate the hazard and protect the public. (Exhibit "9" at pp. 89-90).

51. Inspector Nicarry was initially hopeful that a partial demolition back to the first bearing wall would be all that was needed to alleviate the imminent threat to public safety; accordingly, he instructed Dinosaur Demolition to demolish only the front portion of the building on June 25, 2013. (See Exhibit "5" at ¶ 18).

52. Neither Inspector Nicarry, Chief Heim, Mayor Spencer nor any City employees entered the Building on June 25, 2013. (Exhibit "1" at pp. 85-87); (see also Exhibit "5" at ¶ 23).

53. The following day, June 26, 2013, Inspector Nicarry returned to 1237 Buttonwood Street in the daylight and determined that the partial demolition did not alleviate the threat to public safety. (See Exhibit "5" at ¶ 19).

54. Because Inspector Nicarry was concerned about the continuing threat to public safety, on June 27, 2013, he issued a second notice to Stouffer reaffirming the need to demolish the Building, and also advising that the Building was required to be vacated until a structural engineer could determine whether the Building was safe to reenter. (See Exhibit "5" at ¶ 20); (see also Exhibit "5" at Exhibit "D").

55. Inspector Nicarry also determined the Building might present an attractive nuisance, so he ordered the Building again be placarded, be surrounded by fencing, and boarded up. (See Exhibit "5" at ¶ 21); (see also photographs of the boarded up building with placards which are attached to Exhibit "5" at Exhibit "D").

56. On June 28, 2017, Inspector Nicarry appeared at the Property along with a structural engineer in order to assess whether the remaining portion of the Building was safe for reentry,

57. Stouffer signed a consent permitting Nicarry, a structural engineer, and others, to enter the Building. (See Exhibit "5" at ¶ 22; see also the June 28, 2013 Search Waiver and Consent form, Exhibit "5" at Exhibit "F").

56. The only time that Inspector Nicarry entered the Building was June 28, 2013, after Stouffer signed a waiver permitting [him] to enter the Building. He did not enter the building on any other occasion. (See Exhibit "5" at ¶ 23).

57. On or about July 9, 2013, the structural engineer released his report concluding that the Property was not safe. (See Exhibit "5" at ¶ 24); (see also the true and correct copy of the July 9, 2013 report which is attached to Exhibit "5" as Exhibit "G").

58. On August 19, 2013, the City of Reading Building and Fire Board of Appeals ("Board of Appeals") held a hearing on Stouffer's appeal from the June 25 and June 27 notices. (See Decision of the City of Reading Building and Fire Board of Appeals at p. READING0045, Exhibit "15"); (see also Exhibit "1" at pp. 165-166). After taking testimony and evidence, the Board of Appeals ruled against Stouffer at the close of the hearing, and followed its oral decision with a written decision on September 16, 2013. (Exhibit "15"); see also (Exhibit "1" at p. 165-166).

59. In its written decision, the Board of Appeals concluded:

"The City of Reading presented sufficient evidence confirming that the building located at 1237 Buttonwood Street, Reading, Pennsylvania was an unsafe structure which presented an immediate and imminent danger to public safety and therefore, immediate emergency demolition was required." (Exhibit "15" at p. READING0045).

60. On October 15, 2013, Stouffer filed a notice of appeal from the Board of Appeals' decision with the Berks County Court of Common Pleas. (See Notice of Appeal, Exhibit "16").

61. On February 2, 2016, the Prothonotary of the Berks County Court of Common Pleas issued a Notice of Proposed Termination of Stouffer's appeal, indicating that Stouffer could stop the court from terminating the appeal by filing a

Statement of Intention to Proceed on or before April 2, 2016. (See February 2, 2016 Notice of Proposed Termination of Court Case, Exhibit "17").

62. Stouffer did not file such a notice with the Court of Common Pleas, and on June 3, 2016, the Berks County Court of Common Pleas terminated Stouffer's appeal. (See Dockets from Berks County Court of Common Pleas No. 13-23917, Exhibit "18").

63. Following the Board of Appeals ruling in favor of the City of Reading, on January 29, 2014, Assistant Solicitor Lachat wrote to Plaintiff's attorney advising that he was giving Stouffer another chance to hire his own demolition contractor to finish the demolition of the Building. In the alternative, Lachat offered to let Stouffer enter the portions of the Building that were potentially safe for temporary and limited access as determined by the July 9, 2013 report of the structural engineer, if Stouffer would agree to sign an agreement to indemnify and hold the City of Reading harmless. (See January 29, 2014 letter to Kathleen Dautrich, Esquire, Exhibit "19").

64. When Stouffer did not hire his own demolition contractor to complete the demolition, on November 10, 2014, Inspector Nicarry sent a letter to Stouffer advising that the City of Reading intended to complete the demolition on November 24, 2014. (See November 10, 2014 letter to Stouffer, Exhibit "20").

65. On December 9, 2014, Stouffer filed with the Berks County Court of Common Pleas a complaint and petition for injunction seeking to block the final demolition that had been rescheduled for December 10, 2014. (See Complaint in Stouffer v.

City of Reading, et al., Berks County Court of Common Pleas No. 14- 22386, Exhibit "21").

66. On December 10, 2014, the Honorable Timothy J. Rowley of the Berks County Court of Common Pleas held an off the record meeting with Assistant Solicitor Lachat and Attorney Dautrich on Stouffer's Petition for Injunction. During the conference, Judge Rowley instructed that Stouffer was to provide a list of items that the City of Reading was to try to salvage from the Building and place on the sidewalk for Stouffer to recover them. (Exhibit "13" at pp. 18-19); see also December 10, 2014 Order in Civil Action No. 14-22386, (Exhibit "22").

67. Following the meeting, Judge Rowley entered an Order which states:

Pursuant to Rule 1531(a) Pa.R.C.P. a special or preliminary injunction shall be and is hereby issued enjoining Defendants, their agents, employees, or anyone action [sic] on their behalf from: (a) Attempting demolition of the residence for seven (7) days to allow removal by the City of items listed by Plaintiff. Thereafter the City may proceed with demolition. The City shall coordinate this activity with Plaintiff's counsel.

(See Exhibit "22")(emphasis added).

68. Stouffer never appealed Judge Rowley's December 10, 2014 Order.

69. Based upon Judge Rowley's Order, Stouffer prepared a handwritten list of items that he contended were in the Building. Assistant Solicitor Lachat typed out the list, and emailed it to Plaintiff's attorney, asking that Stouffer limit the list to only to items that are difficult to replace or of significant value, and which were located in the portions of the Building that were deemed safe. (See Exhibit "13" at pp. 17-19); see also December 11, 2014 email from Lachat to Dautrich, Exhibit "23").

70. In the email, Lachat also wrote: "Finally, please let me know which of the following days next week your client is able to be at the property to remove the

items that our demolition contractor is able to remove from the building and place on the curb for your client to pick up: Monday, December 15; Tuesday, December 16; Wednesday December 17; or Thursday, December 18. Please let me know as soon as possible, but if I do not hear back from you by Monday, the City will select one of these dates and place the items on the curb for a reasonable amount of time before disposing of them." (Exhibit 23).

71. Assistant Solicitor Lachat did not receive a response from either Plaintiff's attorney or Stouffer as to which of these dates Stouffer would be available to retrieve his items. (Exhibit "13" at p. 19).

72. On January 21, 2015, Assistant Solicitor Lachat wrote to Plaintiff's attorney again and advised that beginning on January 22, 2015, the demolition contractor would begin removing Stouffer's personal items that were safe to remove, and following the removal of personal property, the final demolition of the structure would begin. (See January 21, 2015 email from Lachat to Plaintiff's attorney, Exhibit "24").

73. At all times relevant to this lawsuit, the City of Reading had adopted Pennsylvania's Uniform Construction Code ("UCC"). (See Exhibit "5" at ¶ 8); see also Reading Code of Ordinances at § 180-101 through § 180-105, (Exhibit "25").

74. At all times relevant to this lawsuit, the City of Reading had adopted the 2009 Edition of the International Existing Building Code ("IEBC"). (See Exhibit "5" at ¶ 8); see also Reading Code of Ordinances at § 180-501 through § 180-507, (Exhibit "27").

75. Inspector Nicarry's June 25, 2013 notice to Stouffer indicated the Building is a

unsafe structure which presents an immediate and imminent danger to public

safety pursuant to § 403.84 of the UCC and therefore under Section 116 and/or

117 of the IEBC, as adopted by the Pa UCC and Chapter 5 of the City of

Reading Codified Ordinances, immediate emergency demolition is required.

(Exhibit "10")(emphasis in original).

76. Section 403.84 of the Pa UCC (Unsafe building, structure or equipment)

provides in pertinent part::

(a) A building code official may determine that a building, structure or equipment
is unsafe because of inadequate means of egress, inadequate light and
ventilation, fire hazard, other dangers to human life or the public welfare, illegal
or improper occupancy or inadequate maintenance. A vacant building or
structure that is not secured against entry is unsafe under this section.

(b) When a building code official determines the existence of an unsafe condition,
the building code official shall order the vacating of the building or structure. ***

(e) A building code official may not rescind the order to vacate until the owner
abates or corrects the unsafe condition.

(See Exhibit "26).

77. Section 116 of the IEBC (Emergency Measures) provides in pertinent part::

116.1 Imminent danger. When, in the opinion of the code official there is
imminent danger of failure or collapse of a building that endangers life, or when
any building or part of a building has fallen and life is endangered by the
occupation of the building, or when there is actual or potential danger to the
building occupants or those in the proximity of any structure because of
explosives, explosive fumes or vapors, or the presence of toxic fumes, gases, or
materials, or operation of defective or dangerous equipment, the code official is
hereby authorized and empowered to order and required the occupants to vacate
the premises forthwith. The code official shall cause to be posted at each
entrance to such structure a notice reading as follows "This Structure is Unsafe,
and Its Occupancy Has Been Prohibited by the Code Official." It shall be unlawful
for any person to enter such structure except for the purpose of securing the
structure, making the required repairs, or removing the hazardous condition, or
demolishing the same.

116.2 Temporary Safeguards. Notwithstanding other provisions of this code, whenever, in the opinion of the code official, there is imminent danger due to an unsafe condition, the code official shall order the necessary work to be done, including the boarding up of openings, to render such structure temporarily safe whether o not the legal procedure herein described has been instituted; and shall cause such other action to be taken as the code official deems necessary to meet such emergency.

116.4 Emergency repairs. For the purposes of this section, the code official shall employ the necessary labor and materials to perform the required work as expeditiously as possible.

116.6 Hearing. Any person ordered to take emergency measures shall comply with such order forthwith. Any affected person shall thereafter, upon petition directed to the appeals board, be afforded a hearing as described in this code.

(Exhibit "28")(emphasis added).

78. Inspector Nicarry was hired by the City of Reading as a Building Inspector on April 2, 2012, and was working in that capacity on June 25, 2013. (Exhibit "5" at ¶ 1).

79. Prior to being hired as a Building Inspector for the City of Reading, Inspector Nicarry had twenty five years of experience in the residential, commercial and industrial housing construction trades which included: "(a) commercial and residential roofing, flooring, concrete, and HVAC installation; (b) drywall planning, installation and finishing; (c) manufacture of commercial modular structures; and (d) design, construction and framing of garages, decks, pole barns and handicap accessibility features." (Exhibit "5" at ¶ 2).

80. As of June 25, 2013, Inspector Nicarry was certified by the Pennsylvania Department of Labor and Industry as a "Building Code Official." (Exhibit "5" at ¶ 3).

81. As of June 25, 2013, Inspector Nicarry was certified by the International Code Council as a "Commercial Building Inspector, Residential Building Inspector, Building Plans Examiner, and Accessibility Inspector/Plans Examiner." (Exhibit "5" at ¶ 4).

82. As a Building Inspector for the City of Reading, Inspector Nicarry was responsible for "performing commercial and residential inspections, plan reviews, approval of permit applications, accessibility assessment, hazard abatement, assessment of blighted and postemergency properties, and determination of remedial actions." (Exhibit "5" at ¶ 5).

83. "As of June 25, 2013, the City of Reading required all of its Building Inspectors to be properly certified by the International Code Council, to keep up to date on all requirements, to keep their certifications current, and to complete all continuing educational requirements to keep their certifications current." (Exhibit "5" at ¶ 6).

84. As of June 2013, Inspector Nicarry was "current on all continuing education requirements of Pennsylvania Department of Labor and Industry and the International Code Council." (Exhibit "5" at ¶ 7).

85. As of June 2013, Inspector Nicarry's training had included instruction on the provisions, requirements and enforcement of the UCC and the IEBC. (Exhibit "5" at ¶ 8).

86. As of June 2013, Inspector Nicarry's training had included instruction on determining "whether a building or structure presents an unsafe condition and

whether it presents an imminent danger of failure or collapse that endangers life." (Exhibit "5" at ¶ 9).

87. "Prior to June 2013, the City of Reading provided training to its Code Enforcement Officers and Building Inspectors (including [Inspector Nicarry] that public officials could not enter a property without the consent of the resident absent a search warrant or exigent circumstances. The training included instruction on what constituted exigent circumstances, and what constituted probable cause for entry pursuant to a search warrant." (Exhibit "5" at ¶ 10).

88. Stouffer does not have any evidence that an unconstitutional policy, procedure or custom of the City of Reading was the moving force behind the demolition and/or partial demolition of the Building. (See Request for Admissions Nos. 19, 20 which are attached as Exhibit "2"). Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

89. While Inspector Nicarry was employed by the City of Reading, "there was never an occasion on which [he] inspected a building that had partially collapsed and which he believed presented an imminent danger to public safety, but [he] did not order the emergency demolition of the building. (Exhibit "5" at ¶ 29).

90. Stouffer has no documents, physical evidence, electronic evidence, tape recordings, video recordings or other evidence that while serving as a Building Inspector and/or Chief Building Official for the City of Reading, Inspector Nicarry inspected any other buildings where bricks had fallen onto the sidewalk and which he reasonably believed presented an imminent danger to public safety, yet

Inspector Nicarry did not order the immediate demolition of that building. (See Request for Admissions Nos. 29, 30 which are attached as Exhibit "2." Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

91. In addition to 1237 Buttonwood Street, there are other buildings in the City of Reading that Inspector Nicarry "inspected following a partial collapse and of which [he] ordered the emergency demolition because [he] believed the building presented an imminent danger to public safety." (Exhibit "5" at ¶ 30).

92. For example, on February 28, 2014, Inspector Nicarry was called to inspect a partial building collapse of the rear wall of a building at 43 S. 9th Street, Reading, Pennsylvania. (Exhibit "5" at ¶ 30(a)).

93. Upon his inspection of the Building, Inspector Nicarry determined that the Building was "an unsafe structure which presented an immediate and imminent danger to public safety." (Exhibit "5" at ¶ 30(b)).

94. As with 1237 Buttonwood Street, "[Inspector Nicarry] ordered the immediate emergency demolition of 43 S. 9th Street because [he] believed the Building was an unsafe structure which presented an immediate and imminent danger to public safety." (Exhibit "5" at ¶ 30(c)); Exhibit "5" as Exhibit "I").

95. The notice of emergency demolition for 43 S. 9th Street is substantially identical to the notice of emergency demolition that was issued for 1237 Buttonwood Street. (Compare Exhibit "10" with Exhibit "5" at Exhibit "I").

96. "As with 1237 Buttonwood Street, due to the imminent threat to public safety presented by the partial collapse at 43 S. 9th Street, the appeal hearing for the

emergency demolition notice was held after the demolition of 43 S. 9th Street." (Exhibit "5" at ¶ 30(e)).

97. Chief Heim twice served as the Chief of Police for the City of Reading. The first time was from 1997 through 2000, and the second time was from 2006 through 2016. (Exhibit "4" at ¶ 1).

98. During Chief Heim's tenures as the Chief of Police for the City of Reading," all new police officers were required to have 750 hours of training certified by the Municipal Police Officers' Education and Training Commission ("MPOETC") as required by Act 120. This training included instruction that all arrests must be supported by probable cause, as well as instruction on the meaning of probable cause." (Exhibit "4" at ¶ 2).

99. "Additionally, all police officers were required to complete all mandatory Act 180 in-service training, and this training included, but was not limited to, legal updates instructing that all arrests must be supported by probable cause, as well as instruction on the meaning of probable cause." (Exhibit "4" at ¶ 3).

100. "In addition to training required by Commonwealth of Pennsylvania, the Reading Police Department provided ongoing training to its officers, including training on the meaning of probable cause and the fact that all arrests must be supported by probable cause." (Exhibit "4" at ¶ 4).

101. Stouffer does not have any evidence that an unconstitutional policy, procedure or custom of the City of Reading Police Department was the moving force behind Stouffer's arrest on June 25, 2013. (See Request for Admissions Nos. 10, 11 as Exhibit "2"). Plaintiff did not respond or object to the Request

within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

102.     Mayor Spencer served as the elected Mayor of the City of Reading from January 2, 2012, until January 4, 2016. (Exhibit "3" at ¶ 1).

103.     Mayor Spencer was not "personally involved with the demolition or partial demolition of the Building." (Exhibit "3" at ¶ 2; see also Request for Admissions Nos. 12, 13, 14 Exhibit "2." Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

104.     Mayor Spencer "did not order or direct the demolition of the Building on or before June 25, 2013." (Exhibit "3" at ¶ 3; Exhibit "5" at ¶ 35); see also Request for Admissions Nos. 12, 13, 14 Exhibit "2." Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

105.     Mayor Spencer "did not order or direct the final demolition of the Building." (Exhibit "3" at ¶ 4; Exhibit "5" at ¶ 35); see also Request for Admissions No. 18 Exhibit "2." Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

106.     Mayor Spencer "did not order or direct the arrest of Stouffer." (Exhibit "3" at ¶ 5).

107.     Stouffer does not have any documents, physical evidence, electronic evidence, tape recordings, video recordings or other evidence that support his contention that Mayor Spencer violated his civil rights. (See Request for

Admissions Nos. 12 Exhibit "2." Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

108.    Chief Heim was not "personally involved with the June 25, 2013 arrest of Stouffer." (Exhibit "4" at ¶ 5); See also Request for Admissions Nos. 2, 3, 4, 5 which are attached as Exhibit "2." Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

109.    Chief Heim did not "order, direct or have prior knowledge of the June 25, 2013 arrest of Stouffer." (Exhibit "4" at ¶ 6); see also Request for Admissions Nos. 2, 3, 4, 5 Exhibit "2." Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

110.    Chief Heim was not "personally involved with the demolition or partial demolition of the Building." (Exhibit "4" at ¶ 7; Exhibit "5" at ¶ 33); see also Request for Admissions Nos. 6, 7, 8, 9 to Exhibit "2." Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

111.    Stouffer does not have any documents, physical evidence, electronic evidence, tape recordings, video recordings or other evidence that support his contention that Chief Heim violated his civil rights. (See Request for Admissions No. 1 to Exhibit "2). Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

112.     Stouffer has presented no documents, physical evidence, electronic evidence, tape recordings, video recordings or other evidence that support his contention in ¶ 75 of Plaintiff's Complaint that Inspector Nicarry conspired "for the purpose of depriving [Stouffer] of his privacy, due process of law, and equal protection of the laws and equal privileges and immunities under the law." (See Request for Admissions No. 22 to Exhibit "2"). Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

113.     Stouffer has no documents, physical evidence, electronic evidence, tape recordings, video recordings or other evidence that support his contention in ¶ 75 of Plaintiff's Complaint that Chief Heim conspired "for the purpose of depriving [Stouffer] of his privacy, due process of law, and equal protection of the laws and equal privileges and immunities under the law." (See Request for Admissions No. 23 to Exhibit "2"). Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

114.     Stouffer has no documents, physical evidence, electronic evidence, tape recordings, video recordings or other evidence that support his contention in ¶ 75 of Plaintiff's Complaint that Mayor Spencer conspired "for the purpose of depriving [Stouffer] of his privacy, due process of law, and equal protection of the laws and equal privileges and immunities under the law." (See Request for Admissions No. 24 to Exhibit "2"). Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

115.    Stouffer has no documents, physical evidence, electronic evidence, tape recordings, video recordings or other evidence that support his contention in ¶ 75 of Plaintiff's Complaint that Defendant City of Reading conspired "for the purpose of depriving [Stouffer] of his privacy, due process of law, and equal protection of the laws and equal privileges and immunities under the law." (See Request for Admissions No. 25 to Exhibit "2"). Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)).

116.    There is no evidence in the record that any of the individual defendants acted outside the scope of their official capacities.

## DISCUSSION

Plaintiff has asserted the following constitutional claims under 42 U.S.C. § 1983 against the City of Reading: deprivation of privacy and unlawful entry in violation of the Fourth Amendment (Counts I, III, IV), deprivation of property, both real and personal, without due process of law in violation of the Fourteenth Amendment (Count II and VII).

Local governments and political subdivisions are not immune from damages liability for claims brought under § 1983. *Owen v. City of Independence*, 445 U.S. 622, 657 (1980). However, a local government is only subject to § 1983 liability where the local government itself causes a constitutional violation. *Monell v. Department of Social Services of City of N.Y.*, 436 U.S. 658, 694 (1978). That is, a local government cannot be held liable under § 1983 simply because of the actions of one of its employees. *Id.* (expressly rejecting municipal § 1983 liability based on a *respondeat superior* theory).

A municipality can be held liable under § 1983 only when the implementation of an officially adopted policy or an informally adopted custom causes the alleged constitutional violation. *Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013). In the absence of an official policy, a course of conduct can be considered a custom when municipal officials' practices are "so permanent and well settled as to virtually constitute law." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). In either instance, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Bielevicz,* v. *Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); *see also Andrews,* 895 F.2d at 1480**.**

Nowhere in his Complaint does Plaintiff identify a policy, custom or practice that the City of Reading implemented that caused any of the alleged constitutional violations. In addition, Plaintiff's counsel failed to respond to defendants' request for admissions, specifically requests Nos.19 and 20 which asked Plaintiff to identify an unconstitutional policy, procedure or custom of the City of Reading that was the moving force behind the demolition and/or partial demolition of the Building. (See Request for Admissions Nos. 19, 20.) Plaintiff also has not presented any evidence that an unconstitutional policy, procedure or custom of the City of Reading was the moving force behind his arrest on June 25, 2013. (See Request for Admissions Nos. 10, 11, Exhibit "2.") Plaintiff did not respond or object to the Request within 30 days, so the Request is deemed admitted pursuant to Fed.R.Civ.P. No. 36(a)(3)). Finally, Plaintiff has not identified any such policy in his response to the defendants' motion for summary judgment.

On the contrary, it is undisputed that the demolition of the Building was ordered pursuant to the Pa. UCC and the 2009 IEBC, both of which had been adopted by the City of Reading, because it was justifiably determined that the Building constituted an immediate and imminent danger to public safety. As a result, judgment will be entered in favor of the defendant City of Reading and against the Plaintiff on Plaintiff's constitutional claims against the City of Reading.

Plaintiff has asserted the following constitutional claims against Mayor Spencer in his official and individual capacities: deprivation of privacy and unlawful entry in violation of the Fourth Amendment (Counts I, III, IV), deprivation of property, both real and personal, without due process of law in violation of the Fourteenth Amendment (Counts II, VII) and deprivation of equal protection of the law in violation of the Fourteenth Amendment (Count X).

Under Third Circuit precedent, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted).

Here, the undisputed record reveals no evidence of participation or actual knowledge on behalf of Mayor Spencer of any of the events that gave rise to this action. On the contrary, Mayor Spencer averred that: 1) he was not personally involved with the demolition or partial demolition of the Building (Exhibit "3" at ¶ 2); 2) he did not order or

direct the demolition of the Building on or before June 25, 2013. (Exhibit "3" at ¶ 3; Exhibit "5" at ¶ 35); 3) he did not order or direct the final demolition of the Building. (Exhibit "3" at ¶ 4; Exhibit "5" at ¶ 35); and 4) he did not order or direct the arrest of Stouffer. (Exhibit "3" at ¶ 5). Plaintiff has not refuted any of these averments. Accordingly, judgment will be entered in favor of Mayor Spencer and against the Plaintiff on Counts I, II, III, IV, VII and X.

Plaintiff has asserted the following constitutional claims against Chief Heim: deprivation of property, both real and personal, without due process of law in violation of the Fourteenth Amendment (Counts II, X), deprivation of privacy and unlawful entry in violation of the Fourth Amendment (Counts III and V).

Once again, the undisputed record does not reveal any evidence of participation or actual knowledge on behalf of Chief Heim of any of the events that gave rise to this action. On the contrary, Chief Heim averred that: 1) he did not order, direct or have prior knowledge of the June 25, 2013 arrest of Stouffer. (Exhibit "4" at ¶ 6); 2) he was not personally involved with the demolition or partial demolition of the Building. (Exhibit "4" at ¶ 7; Exhibit "5" at ¶ 33). Plaintiff has not refuted any of these averments. Accordingly, judgment will be entered in favor of Chief Heim and against plaintiff on Counts II, III, V and X.

Plaintiff has asserted the following constitutional claims against Inspector Nicarry: deprivation of property, both real and personal, without due process of law in violation of the Fourteenth Amendment (Count II), deprivation of privacy and unlawful entry in violation of the Fourth Amendment (Count III); deprivation of due process of law in

violation of the Fourth Amendment (Count VIII) and deprivation of equal protection of the law in violation of the Fourteenth Amendment (Count XI).

Plaintiff's Fourth Amendment claim against Nicarry fails because there is no evidence in the record that Nicarry played any role in Plaintiff's arrest. Indeed, Nicarry specifically averred that he did not order, direct or suggest that Plaintiff should be arrested. (Exhibit "5" at ¶ 31). This averment has not been refuted by Plaintiff.

Plaintiff's Fourth Amendment claim against Nicarry based upon unlawful entry is also without merit. Nicarry averred that on the date of the partial collapse, June 25, 2013, he did not enter the Building. (See Exhibit "1", pp. 85-87; Exhibit 5, ¶ 23). According to Nicarry, the only time he ever entered the Building was on June 28, 2013, during the inspection by a structural engineer. (Exhibit "5", ¶¶ 22-23.) However, this entry was made pursuant to a Search Waiver and Consent signed by Plaintiff himself. See Exhibit 5 at Exhibit "F". Plaintiff cannot maintain a Fourth Amendment claim against Inspector Nicarry for an illegal entry onto his Property where the only entry by Nicarry was made with Plaintiff's full knowledge and signed consent. (Exhibit "5", ¶ 23).

Plaintiff's due process claims against Nicarry are also without merit. Due process requires that any "deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). The "root requirement" of due process is that "an individual be given an opportunity for a hearing <u>before</u> he is deprived of any significant property interest." *Id.* (citing *Boddie v. Connecticut*, 401 U.S. 371, 379

(1971)) (emphasis in original). However, where there is "the necessity of quick action by the State," or where "providing any meaningful pre-deprivation process" would be impractical, the Government is relieved of the usual obligation to provide a pre-deprivation hearing. *Parrat v.* Taylor, 451 U.S. 527, 539 (1981).

Our Court of Appeals has stated that the test for whether a pre-deprivation hearing is required is whether there was in fact an emergency and, if so, whether the municipality's actions were arbitrary or an abuse of discretion. *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F. 3d 412, 418 (3d Cir. 2008).

> During his inspection of the Building, Inspector Nicarry observed that:
>
> (1) structural bricks had fallen from the second floor of the Building onto the public sidewalk along Buttonwood Street;
>
> (2) the falling bricks exposed floor joists that had rotted from long term water infiltration;
>
> (3) pressure from failing structural support had caused the considerable bowing of the cornice and buckling of a PVC pipe running down the side of the Building; and
>
> (4) a spider-webbed crack on the side of the building following the mortar line to the top corner of the building indicated that this section was in danger of breaking away.

(*See* Exhibit "5", ¶ 13; Exhibit "9", pp. 85-88.)

Based upon these observations, Inspector Nicarry concluded that the Building was in imminent danger of collapse and, therefore, posed an immediate threat to public safety. (*See* Exhibit "5", ¶ 14). The Court finds that an emergency existed and none of the  actions taken by Nicarry in ordering only the partial demolition of the Building without allowing Plaintiff a pre-deprivation hearing were arbitrary or an abuse of

discretion. Accordingly, the Court finds that the defendants were relieved of providing Plaintiff with a pre-deprivation remedy.

The record reveals that Plaintiff took advantage of his post-deprivation remedies, including an appeal from the June 25 and June 27, 2013 notices to the Board of Appeals and to the Berks County Court of Common Pleas. The Board of Appeals ruled against Plaintiff and Plaintiff subsequently abandoned his appeal to the Berks County Court of Common Pleas.  On December 9, 2014, one day before the remainder of the Building was scheduled to be demolished, Plaintiff filed with the Berks County Court of Common Pleas a complaint and petition for injunction seeking to block the final demolition.  Judge Rowley enjoined the defendants from demolishing the remainder of the Building for seven days so that Plaintiff could present a list to the City of Reading of items he wanted removed prior to the final demolition. Plaintiff never appealed Judge Rowley's December 10, 2014 Order.

There is nothing in the record to suggest the post-deprivation appeals process was inadequate. On the contrary, Plaintiff abandoned the appeals process and filed suit in this Court.  "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000), citing *McDaniels v. Flick*, 59 F.3d 446, 460 (3d Cir. 1995). A plaintiff who fails to avail himself of available due process procedures cannot claim abridgement of his due process rights. *Id.* at 116. Accordingly, judgment will be entered in favor of Inspector Nicarry on Plaintiff''s procedural due process claim under the Fourteenth Amendment

To the extent Plaintiff asserts a claim against Nicarry for a substantive due process violation against Nicarry, the Court notes that in order to succeed on this claim plaintiff must prove, *inter alia*, government action that "shocks the conscience." *United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d at 392, 399. (3d Cir. 2003). "The 'shocks the conscience' standard encompasses 'only the most egregious official conduct.'" *Id*. The Court finds, as a matter of law, that none of the actions taken by Nicarry (or any of the other defendants) rise to the level of conscience-shocking.

Plaintiff's equal protection claim against Nicarry is also without merit. Since Plaintiff is not a member of any protected class, his equal protection claim arises under a "class of one" theory. To state a claim for a "class of one," a plaintiff must at minimum show "that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for such treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).  Inspector Nicarry specifically averred that "there was never an occasion on which he inspected a building that had partially collapsed and which he believed presented an imminent danger to public safety, but he did not order the emergency demolition of the building." (Exhibit "5" at ¶ 29). Indeed, Nicarry averred that he took the exact same actions he took in this case with respect to a partial building collapse of the rear wall of a building at 43 S. 9th Street, Reading. (Exhibit "5" at ¶ 30(a)-(e)). Plaintiff does not refute any of these averments. Plaintiff was treated no different than any other property owner in Reading.

To the extent plaintiff is asserting a claim against an unnamed John Doe defendant such as Officer Voorhies for unlawful arrest, that claim is also without merit.

To prevail on a Section 1983 claim for unlawful arrest, Plaintiff must allege that his arrest deprived him of a constitutional right. *See Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). Generally, a plaintiff can show his constitutional rights have been violated if he was arrested without probable cause. *Groman*, 47 F.3d at 636; *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). Conversely, an arrest based on probable cause cannot be the source of a claim for false arrest or false imprisonment. *Groman*, 47 F.3d at 636.

Plaintiff was arrested for disorderly conduct. In Pennsylvania, disorderly conduct is defined as follows:

> **Offense defined**. – A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior;
> (2) makes unreasonable noise;
> (3) uses obscene language, or makes an obscene gesture; or
> (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa. C.S.A. § 5502(a).

Arresting Officer Voorhies observed Plaintiff yelling and cursing at firefighters, police and demolition contractors while in the presence of a group of bystanders that included young children. (See Exhibit "1", p. 89-90, 93-95; Exhibit 11). He failed to comply with a warning from a Police Sergeant and instead continuing with his loud and offensive conduct. (See Exhibit "1", p. 91). Considering that Plaintiff's yelling and use of obscene language occurred in full view of numerous police officers, Officer Voorhies had more than sufficient probable cause to arrest Plaintiff for disorderly conduct under

18 Pa. C.S.A. § 5502. The Court also notes that Plaintiff used profanity and made crude remarks during his deposition. Thus, Plaintiff's Fourth Amendment claim against the John Doe defendants for unlawful arrest is without merit.

Plaintiff has asserted a claim pursuant to 42 U.S.C. § 1985(3) against all the defendants for conspiracy to interfere with civil rights.

Section 1985(3) creates a private cause of action for damages incurred "[i]f two or more persons . . . conspire . . . for the purpose of depriving . . . any person of the equal protection of the laws." 42 U.S.C. § 1985(3). In order to establish his claim under § 1985(3), plaintiff must establish the following elements: "'(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006), quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983). The Supreme Court has made clear that § 1985(3) does not provide a cause of action for "all tortious, conspiratorial interferences with the rights of others" or create "general federal tort law." *Id.*, 440 F.3d at 135, quoting *Griffin v. Breckenridge*, 403 U.S. 88, 101-02 (1971). Instead, plaintiff must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" in order to state a claim. *Griffin*, 403 U.S. at 102.

Our Court of Appeals has stated that "the rule is clear that allegations of a conspiracy must provide some factual basis to support the existence of the elements of

a conspiracy: agreement and concerted action." *Capogrosso v. N.J. Sup. Ct.*, 588 F. 3d 180, 185 (3d Cir. 2009). citing *Crabtree v. Muchmore*, 904 F.2d 1475, 1480-81 (10th Cir. 1990);

As the Court finds the record contains absolutely no evidence of any type of conspiracy by the defendants against Plaintiff, judgment will be entered in favor of the defendants on this claim.

Finally, Plaintiff has asserted a pendant claim against the defendants for negligence. The Political Subdivision Tort Claims Act ("the Act"), 42 Pa. Cons.Stat. § 8541, *et seq.,* immunizes the City of Reading and its employees from most state law claims. The Plaintiff may proceed with a state law claim only if it fits into one of the eight exceptions enumerated in § 8542(b).

Plaintiff does not argue that the demolition of the Building falls under any particular exception. The only exception that is even remotely applicable is the "care, custody and control of real property" exception. However, for this exception to apply, the City of Reading must actually possess or control the real property in question. 42 Pa. Cons.Stat. § 8542(b)(3). "Possession" under this exception requires total control over the premises. Limited control or mere occupation of the premises for a limited period is not sufficient to impose liability. *City of Pittsburgh v. Estate of Stahlman,* 677 A.2d 384, 386–87 (Pa.Cmwlth.1996). *See also York Redev. Auth. v. Keener,* 101 Pa.Cmwlth. 464, 516 A.2d 832, 833–34 (1986).

The real property section applies "only to those cases where acts of the local agency or its employees make the property unsafe for the activities for which it is regularly used, for which it is intended to be used or for which it may reasonably be

foreseen to be used." *Mascaro v. Youth Study Ctr.,* 514 Pa. 351, 361–62, 523 A.2d 1118 (1987). Furthermore, it only applies to those cases where it is alleged that the artificial condition or defect of the land itself causes the injury, not merely when it facilitates the injury by acts of others. *Id.* at 362.

In the present case, the City of Reading ordered the demolition of a building. A property defect did not cause an injury. *See Id.; Kiley v. City of Philadelphia,* 537 Pa. 502, 506–07, 645 A.2d 184 (1994). The Court finds that this exception does not apply to the present case and judgment will be entered in favor of the defendants on Plaintiff's negligence claim.

Plaintiff also claims that defendant Wrecking Co. was negligent. Since the Court has already entered judgment in favor of the defendants on all of Plaintiff's federal claims, the Court will decline to exercise pendant jurisdiction over this claim. *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).